J-S71023-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| FORREST JAMES WILSON | |
| Appellant | No. 801 EDA 2017 |

Appeal from the Judgment of Sentence February 23, 2017
In the Court of Common Pleas of Bucks County
Criminal Division at Nos: CP-09-CR-0004181-2016

BEFORE:  PANELLA, STABILE, and PLATT,* JJ.

MEMORANDUM BY STABILE, J.:                   **FILED APRIL 16, 2018**

Appellant, Forrest James Wilson, appeals from the February 23, 2017 judgment of sentence of 12-24 months' imprisonment for reckless endangerment.[1]  Appellant argues that the evidence was insufficient to sustain his conviction, and that his guilty verdict for reckless endangerment is inconsistent with his not guilty verdicts on other charges.  We affirm.

The following evidence was adduced during trial.  The victim, Amilla Laidler, testified that she had previously lived with Appellant and her daughter in Apartment 4, the second floor unit, in a duplex at 819 Cedar Avenue in Croydon, Bristol Township, Bucks County, Pennsylvania.  Laidler and her

_____

* Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. § 2705.

daughter had moved out of the apartment in March 2015, leaving many of her possessions behind. Appellant continued to live in Apartment 4. Laidler testified that she left Appellant because he was violent. She described certain incidents that occurred shortly before, and leading up to, her leaving Appellant. On one occasion, Appellant took Laidler's car keys and would not let her leave the apartment. During that incident, she testified that Appellant punched her and threw her to the ground by her hair. On another occasion, he accused her of "messing around," which she denied. He then pulled out a wire object that looked like pieces of wire hanger twisted together. He threatened to beat her with it if she continued to lie about it. N.T. 10/25/16, pp. 61-62, 107. On a third occasion, he cornered her in the bathroom of Apartment 4, plugged in a clothing iron and threatened to burn her with it. *Id.* at 109-10.

On May 20, 2015, shortly before 11:30 p.m., Laidler contacted Appellant via text and asked if she could come into the Apartment 4 to get some clothing. Laidler stated she was going on vacation the following day to Myrtle Beach and wanted to retrieve some items left in the apartment. Appellant agreed. At 11:30 p.m., Laidler ended her shift at her place of employment and drove directly to the apartment. Upon arrival, Laidler again texted Appellant asking if he would bring her things down to her. He responded that she was to come up to the apartment and get them. *Id.* at 55.

Laidler went up the apartment and straight to the bedroom to retrieve her clothing. She observed at some point that Appellant had locked the apartment door after she entered and remained standing at the door. As she was getting her items, including her bathing suit and other summer-type clothing, Appellant entered the bedroom and began questioning her about what she had been doing and about other men (people she was "messing with"). Laidler saw Appellant with the same wire object described above. He began striking her with the object, in a whipping fashion, on her arms and legs, while continuing to accuse her of "messing" with other men. *Id.* at 58-59, 61, 118. Laidler was crying and denied sleeping with other men, and she used her hands to try to block the strikes. When Laidler told Appellant she was leaving, he told her that she "was going to die tonight if [she] left." *Id.* at 68, 122. When she told Appellant that she was going to call the police, he knocked her cell phone from her hand, breaking it.

Laidler was afraid of Appellant and was trying to think of a way to leave the apartment. She continuously asked Appellant for a glass of water to make him move away from her. Eventually he agreed and walked from the bedroom into the kitchen. When Appellant moved into the kitchen, Laidler grabbed her purse and cell phone and ran to the bathroom, locking the door behind her. She considered climbing through the bathroom window to get away. She testified: "[Appellant] wasn't going to let me go. He was going to continue to hit me. I was scared. I didn't know how else to get out of that apartment."

*Id.* at 80.  Immediately after, Appellant began breaking through the bathroom door.  Laidler had no time to think, and she managed to open the bathroom window and jumped from the second story building to the grass below, injuring her ankle.  *Id.* at 72-75, 79, 87.

Laidler heard Appellant jump from the window behind her and fall to the ground.  She continued to run, explaining that she was afraid as Appellant appeared to be right behind her, and she did not want to take the time to try to find her car keys in her purse.  She ran to a nearby Sunoco gas station, where she saw a couple with a baby outside in the parking lot.  She asked them to call 911; the woman did so.  The 911 call, which was played for the jury, took place at approximately 12:12 a.m. on the morning of May 21, 2015.  The caller reported that the victim advised that a guy was trying to kill her.  Laidler can be heard in the background, audibly upset.  While waiting for police to arrive, Laidler stayed in the couple's vehicle.  A short time later, the police and an ambulance arrived at the Sunoco.  Laidler was transported to Lower Bucks Hospital with cuts and abrasions on her hands, arms and legs.  Her ankle was wrapped and she was released.  *Id.* at 86-99.

Officer Jason Mancuso of the Bristol Township Police responded to the Sunoco gas station and met with Laidler.  She was out of breath, was crying hysterically and had visible injuries to her arms and palms.  The injuries to her palms looked like defensive injuries.  Laidler stated that Appellant had struck her with a wire object causing her injuries.  She was barefoot and

complained of pain to her ankle. The officer also saw the damage to Laidler's phone. *Id.* at 131-33, 145.

Police officers went to Apartment 4 and met with Appellant. Appellant had an obvious injury to his ankle that appeared to be a break. Officer Mancuso observed that the kitchen and bedroom were in disarray, with items knocked over, indicating that a recent physical altercation. He described the bathroom door as "destroyed," with the frame and molding broken and a slab of the door lying on the floor. *Id.* at 136. Police did not recover a wire object. *Id.* at 145.

Appellant told police that the victim had come over to the apartment, and he claimed that he believed she took $700.00 from him and ran into the bathroom. He stated that he broke down the door to confront her to get his money back. He told police that she pushed him out the window, causing him to injure his ankle. Officer Mancuso did not find any money (or very little money) in Laidler's possession. *Id.* at 137, 148, 152.

Appellant was a large man, over 6 feet tall, well-built and strong. Laidler was 5'9," approximately 130 lbs. and did not appear physically strong or fit. Appellant was transported to Aria Hospital, Bucks County Campus, for treatment, and he reported to the medical staff that his injury was caused when he jumped out of a window landing on his feet. *Id.* at 140-45.

At the preliminary hearing in this case, after Laidler testified, Appellant told her in open court, "you don't know who you're messing with." *Id.* at 147.

Appellant also testified at trial. His testimony was, in many respects, non-responsive and argumentative. He denied that he and Laidler were ever in a romantic relationship, despite the fact that they lived together. Appellant attempted to disparage Laidler by accusing her of using drugs. Yet, he testified that they occasionally saw each other after she moved out, including earlier in the day on May 20, 2015, which Laidler denied. Appellant corroborated Laidler's account of the incident, in part. However, he did not admit to hitting her, stating that he did not care enough about her "to be beating on her." N.T., 10/26/18, at 18. Appellant offered no explanation to the condition of the apartment, with the exception of the bathroom door. Appellant maintained that he thought Laidler stole his rent money, so he kicked in the bathroom door and pursued her, following her out the window onto the roof. He claimed that while partially still in the window, Laidler pushed back at him, causing him to fall and break two bones in his leg. He did not describe what happened to Laidler, how she exited the window or made it to the Sunoco.

Appellant admitted pursuing Laidler out of the bathroom window, stating: "If I caught her, she probably would have gotten assaulted, wouldn't have been no simple assault, would have been criminal assault if I caught her with my money, but I couldn't catch her." *Id.* at 18. Appellant further volunteered, "I done a lot of stuff all my life. I've been a predator all my life, but I don't prey on people no more. If I can't help you, I don't hurt you,

unless you're trying to hurt me. I ain't nobody's prey. That's what I'm trying to explain to her, I don't care what you do, so long as you don't do it to me." *Id.* at 17. However, despite his violent conduct and admitted intent, Appellant also testified that he did not know for sure that Laidler took his money and that he did not directly accuse her of taking the money or even mentioning this to her. When questioned about calling police for the alleged theft of his monies, Appellant replied, "I don't call the police." *Id.* at 31.

The jury found Appellant guilty of reckless endangerment but not guilty of possessing an instrument of crime, simple assault, terroristic threats and harassment.

Appellant's first argument in this appeal is that the evidence was insufficient to support his conviction for reckless endangerment.

> As a general matter, our standard of review of sufficiency claims requires that we evaluate the record "in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence." ***Commonwealth v. Widmer***, [] 744 A.2d 745, 751 ([Pa.] 2000). Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Nevertheless, the Commonwealth need not establish guilt to a mathematical certainty. Any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.

***Commonwealth v. Rahman***, 75 A.3d 497, 500-01 (Pa. Super. 2013).

A person is guilty of reckless endangerment if "he recklessly engages in conduct which places or may place another person in danger of death or

serious bodily injury." 18 Pa.C.S. § 2705. Reckless endangerment can occur when the defendant's conduct creates danger of death or serious bodily injury to the victim by causing a "panic situation." ***Commonwealth v. Trowbridge***, 395 A.2d 1337, 1341 n. 14 (Pa. Super. 1977). Appellant clearly caused a "panic situation" here. Laidler testified that Appellant struck her repeatedly and would not permit her to leave and broke her phone when she said she was calling police. Appellant's threats and violent conduct placed her in fear of her safety. When she was able to lock herself in the bathroom away from Appellant, Appellant pursued her and broke down the bathroom door to get to her, which forced her to jump from a second story window to escape him. As the trial court reasoned:

> The evidence, including Laidler's dangerous escape from the second floor bathroom window, [Appellant's] own admission that he not only kicked in the bathroom door off its hinges but also jumped from the same window, breaking his leg and back in the process, and Officer Mancuso's testimony that the apartment appeared "destroyed" after that incident, revealed that an extremely violent and reckless encounter had occurred between [Appellant] and Laidler. At the very least, Laidler had reasonable cause to believe that as a result of [Appellant's] conduct and actions she was in imminent danger of great bodily harm.

Trial Court Opinion, 4/27/17, at 5-6. For these reasons, Appellant's challenge to the sufficiency of the evidence fails.

In his second and final argument, Appellant contends that the guilty verdict for reckless endangerment was inconsistent with the not guilty verdict on all other charges. Appellant is not entitled to relief.

Inconsistent verdicts are permissible in Pennsylvania. ***Commonwealth v. States***, 938 A.2d 1016, 1025 (Pa. 2007).

> Inconsistent verdicts, while often perplexing, are not considered mistakes and do not constitute a basis for reversal. Rather, the rationale for allowing inconsistent verdicts is that it is the jury's sole prerogative to decide on which counts to convict in order to provide a defendant with sufficient punishment. When an acquittal on one count in an indictment is inconsistent with a conviction on a second count, the court looks upon the acquittal as no more than the jury's assumption of a power which they had no right to exercise, but to which they were disposed through lenity. Thus, this Court will not disturb guilty verdicts on the basis of apparent inconsistencies as long as there is sufficient evidence to support the verdict.

***Commonwealth v. Frisbie***, 889 A.2d 1271, 1273 (Pa. Super. 2005). As discussed above, there was ample evidence to support the guilty verdict for reckless endangerment. Thus, assuming *arguendo* that the verdicts were inconsistent, Appellant's conviction for reckless endangerment still stands.

In any event, the trial court cogently reasoned that the verdicts were actually consistent:

> A review of the record reveals that clear discrepancies existed between the testimonies of Laidler and [Appellant] concerning the injuries Laidler sustained during this incident. Laidler alleged her injuries resulted from a beating [Appellant] administered to her in the bedroom with a piece of wire while he interrogated her about her current personal relationships. She testified that the wire appeared to be about a foot long and approximately an inch thick and was constructed from the "bottom parts of metal hangers intertwined." [Appellant], however, denied ever beating her with, or even possessing, such a wire, and suggested she sustained those "bruises by climbing off the roof and climbing out that window." Furthermore, Officer Mancuso testified that he did not find the wire when he responded to the apartment on May 21, 2015. (***See*** N.T. 10/25/16, pp. 61-66, 118, 151; N.T. 10/26/16, p. 14.)

- 9 -

The testimony of [Appellant] and Laidler also differed as to the underlying cause of the violence that occurred that night. According to Laidler, her alleged beating by [Appellant] stemmed from his jealousy of potential intimate relationships she might be having with other men. Not surprisingly, [Appellant] denied ever striking Laidler or having any romantic interest in her. He suggested she was "drug addict," and he testified that after Laidler went into the bathroom and locked the door, he discovered that she had allegedly stolen $700[.00] from his dresser drawer. He asserted that that was the reason for his kicking the door in and chasing after her. (*See* N.T. 10/25/16, pp. 58-61, 117-123, 137, 148; N.T. 10/26/16, pp. 13-18.)

It is well-established that "[t]he weight of the evidence is a matter exclusively for the finder of fact, who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses." *Commonwealth v. Gonzalez*, 109 A.3d 711, 723 (Pa. Super. 2015). Here, the discrepancies in the testimony as well as the lack of physical evidence regarding the wire were apparently sufficient to create reasonable doubt in the minds of the jurors that [Appellant] was guilty of the charges of possessing an instrument of crime and simple assault.

Furthermore, it is reasonable to assume that the jury determined that in certain aspects, [Appellant] was the more credible witness and that his version of the events instilled some doubt in the jurors' minds as to veracity of Laidler's description of what had occurred or her explanation of the causes that led to the events of that night. Consequently, the jury could conclude from [Appellant]'s version of those events that reasonable doubt existed as to his guilt of the remaining charges of terroristic threats and harassment.

Trial Court Opinion, 4/27/17, at 7-8. Accordingly, Appellant's second argument fails.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/16/18